UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,    :    **ECF Case**

      -v-        :    S4 09 Cr. 341 (VM)

JOSE PEÑA,    :
    a/k/a "Chelo," and
HECTOR RAYMOND PEÑA,    :
    a/k/a "Frank Rodriguez,"
    a/k/a "Montana," and    :

      Defendants.    :

- - - - - - - - - - - - - - X


# GOVERNMENT'S MOTIONS *IN LIMINE*


PREET BHARARA
United States Attorney for the
Southern District of New York,
Attorney for the United States
    Of America

LAURIE A. KORENBAUM
TIMOTHY D. SINI
MICAH W. J. SMITH
Assistant United States Attorneys
   - Of Counsel -

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . i

Background/Relevant Facts . . . . . . . . . . . . . . . . . . . 2

    A.    The Charges . . . . . . . . . . . . . . . . . . 2

    B.    The Murder of Pedro Medina . . . . . . . . . . 4

    C.    The Murders of Jose Suarez and Juan Carmona . . . . . 5

    D.    The Parking Lot at 156th Street and Southern
        Boulevard . . . . . . . . . . . . . . . . . . . 7

I.    EVIDENCE OF OTHER BAD ACTS COMMITTED BY THE DEFENDANTS IS
    ADMISSIBLE . . . . . . . . . . . . . . . . . . . . . . 8

    A.    Applicable Law . . . . . . . . . . . . . . . . 9

    B.    The Incidents and Other Evidence to Be Introduced
        at Trial, and the Bases of Admissibility for
        Such Evidence . . . . . . . . . . . . . . . . . 12

        1.    Prior Arrests and Guilty Pleas of Each
            of the Defendants . . . . . . . . . . . . . 12

        2.    The Participation of the Defendants Jose
            Peña and Hector Raymond Peña and Several
            of the Cooperating Witnesses in the
            Robberies and Attempted Robberies of
            Drug Dealers . . . . . . . . . . . . . . . 14

        3.    Robberies of Illegal Gambling
            Establishments by Defendants Jose Peña
            and Hector Raymond Peña . . . . . . . . . . 15

        4.    The Kidnaping and Attempted Murder of a Drug
            Dealer by Rafael Francisco and Defendant Hector
            Raymond Peña Shortly Before the Murder of Pedro
            Medina and the Subsequent Efforts of Defendant
            Jose Peña to Locate and Kill the Drug Dealer . 15

        5.    Defendant Hector Raymond Peña's
            Assistance in Enforcing a Drug Debt Owed
            to Solid Gold . . . . . . . . . . . . . . . 17

        6.    Defendant Jose Peña's Assistance in
            Enforcing a Drug Debt Owed to an
            Associate of Solid Gold . . . . . . . . . . 17

7.  A Robbery Committed by Defendant Jose Peña and Other Members of the Parking Lot Crew . . . . . . . . . . . . . . . . . 18

8.  Guns and Police Paraphernalia Stashed at the Parking Lot . . . . . . . . . . . . . 19

9.  Defendant Jose Peña's Efforts to Locate "Rubio" Both Before and After the Double Homicide . . . . . . . . . . . . . 19

10. Use of Powder Cocaine by Defendants Jose Peña and Hector Raymond Peña Provided to Them by Certain of the Cooperating Witnesses . . . . . . . . . . . . . . . . . 20

11. Threats Made By Rafael Francisco and Defendant Jose Peña Against a Cooperating Witness's Family . . . . . . . . 20

12. Defendant Hector Raymond Peña's Incarceration at the Time of the Parking Lot Surveillance and the Peña Brothers' Incarceration at the Time a Warrant Was Executed at the Parking Lot . . . . . . . . 21

13. Occasion on Which Defendant Hector Raymond Peña Provided Cocaine to a Cooperating Witness to Sell at Alphabet City Spot . . . . . . . . . . . . . . . . . 22

14. Occasion on Which Defendant Hector Raymond Peña Appeared in Police Garb . . . . 22

15. Defendant Hector Raymond Peña's Offer to a Cooperating Witness to Commit Murder . . . 23

16. Defendant Hector Raymond Peña's Participation in Enforcing Solid Gold's Exclusive Drug Territory at the Alphabet City Spot . . . . . . . . . . . . . . . . . 24

C.  The Proffered Evidence Should Not Be Excluded Under Rule 403 . . . . . . . . . . . . . . . . . . . . . . 24

II.  STATEMENTS OF NON-TESTIFYING WITNESSES . . . . . . . . .  25

     A.   Applicable Law . . . . . . . . . . . . . . . . .  26

     B.   Discussion . . . . . . . . . . . . . . . . . . .  34

III. THE COURT SHOULD LIMIT THE CROSS EXAMINATION OF CERTAIN OF
     THE COOPERATING WITNESSES . . . . . . . . . . . . . .  38

     A.   Applicable Law . . . . . . . . . . . . . . . . .  39

     B.   Discussion . . . . . . . . . . . . . . . . . . .  41

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . .  44

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,      :

            -v-                :      S4 09 Cr. 341 (VM)

JOSE PEÑA,                     :
     a/k/a "Chelo," and
HECTOR RAYMOND PEÑA,           :
     a/k/a "Frank Rodriguez,"
     a/k/a "Montana,"          :

            Defendants.        :

- - - - - - - - - - - - - - X

### GOVERNMENT'S MOTIONS *IN LIMINE*

The Government respectfully submits this memorandum of law in support of its motion *in limine* to offer at trial certain evidence against the defendants Jose Peña and Hector Raymond Peña. The evidence, which is described below, is admissible because it:

(1) constitutes direct proof of the charges in the Indictment, including the existence, nature, and background of the charged murder-for-hire conspiracies;

(2) is proof of the *modus operandi* employed in the commission of the charged offenses;

(3) is evidence of a prior and subsequent course of criminal dealing between the defendants, the cooperating witnesses and others;

(4) demonstrates the relationship of trust that existed during the course of the charged crimes between the defendants and the Government's cooperating witnesses; and

(5) is background to, part of, and inextricably intertwined with the participation of these defendants in the charged crimes, and is necessary to complete the stories of the charged offenses.

In the alternative, some of the evidence is admissible because it constitutes *Giglio* material for the Government's cooperating witnesses and it would mislead the jury to limit the testimony so as to exclude or redact out the participation of the defendants in these incidents.

The Government also moves to admit certain statements of non-testifying participants in the charged crimes, pursuant to Rules 801(d)(2)(E) and 804(b)(3) of the Federal Rules of Evidence as co-conspirator statements and statements against penal interest. Finally, the Government seeks rulings precluding the cross-examination of three of the Government's cooperating witnesses concerning certain discrete matters described below, because those matters have no bearing on the witnesses' credibility or capacity to testify truthfully, and would likely unduly prejudice the jury against these witnesses.

## BACKGROUND/RELEVANT FACTS

### A. The Charges

The defendants are charged in an eight-count indictment with murder-for-hire, in violation of Title 18, United States Code, Section 1958, and the possession of guns used in the commission of murders, in violation of Title 18, United States Code, Section 924(j). Specifically, Defendant Hector Raymond Peña, a/k/a "Frank Rodriguez," a/k/a "Montana," is charged with the drug-related murders of Pedro Medina (Counts One, Two, and

Three), and Jose Suarez and Juan Carmona (Counts Four, Five, Six, Seven, and Eight). Defendant Jose Peña is charged in Counts Four, Five, Six, Seven, and Eight with the murders of Suarez and Carmona.

Pedro Medina was murdered on May 9, 1997 and Jose Suarez and Juan Carmona were murdered together on June 25, 1997. As charged in the Indictment, and as the proof at trial will demonstrate, defendant Hector Raymond Peña and Rafael Francisco, a/k/a "67," along with Richard Fontanez, a/k/a "Romantico," were hired by a group of drug dealers to murder Medina so that the drug dealers could take over Medina's lucrative drug territory on the lower east side of Manhattan. A few weeks after Medina was murdered, defendant Jose Peña, and his brother, defendant Hector Raymond Peña, along with Rafael Francisco and Richard Fontanez,[1] were hired by a drug dealer named Jose Acosta, a/k/a "Chino," to kill members of a robbery crew, including Suarez, who had killed Chino's brother during a botched drug robbery.[2] Chino paid Vladimir Delacruz, a member of the robbery crew, to provide him

_____

[1]    Fontanez was convicted after trial in 2000 in New York County for his participation in the murders of Suarez and Carmona, and pled guilty to a third and unrelated murder. He is serving a life sentence with no possibility of parole and has not been charged in this case. Francisco previously pled guilty in this case to the murders of Suarez and Carmona and will not be a defendant at trial.

[2]    Juan Carmona was not a member of the robbery crew and was killed because he happened to be with Suarez when Suarez was abducted.

with information about the identities and locations of members of the crew so that Chino could have them all murdered.

## B.    The Murder of Pedro Medina

On May 9, 1997, the body of Pedro Medina was found partially covered with a plastic garbage bag near the Henry Hudson Parkway.  Medina had been shot through the head and his body discarded by the side of the road.

The proof at trial will demonstrate that Medina was a cocaine dealer who "owned" a retail spot on the lower east side of Manhattan.  Medina's spot was lucrative, and as a result, a group of drug dealers who had previously run a crack cocaine spot in the Bronx, and who had called themselves "Solid Gold," decided to move in on Medina's territory.  Solid Gold's encroachment did not go unnoticed, and Medina responded by threatening members of the Solid Gold crew and demanding that they refrain from selling drugs in the vicinity of his spot.  Solid Gold decided to have Medina killed so they could take over the spot.

To that end, the evidence will show, several members of Solid Gold, including three cooperating witnesses who will testify at trial, CW-1, CW-2 and CW-3, solicited Rafael Francisco and defendant Hector Raymond Peña – both of whom congregated regularly at an outdoor parking lot at 156th Street and Southern Boulevard in the Bronx (the "Parking Lot") – to murder Medina and agreed to pay them to do so.  Members of Solid Gold, including

4

CW-1, provided defendant Rafael Francisco and others with guns – including a .38 caliber revolver – to commit the murder of Medina. On the morning of the murder, Rafael Francisco, defendant Hector Raymond Peña, and Richard Fontanez confronted Medina outside his home in Brooklyn, New York, and, impersonating police officers, abducted him. Medina was then murdered and his body dumped by the side of a public road. The .38 caliber gun that was used to kill Medina was not returned to members of Solid Gold.

## C.   The Murders of Jose Suarez and Juan Carmona

In 1997, Oliver Martinez, the young brother of a large-scale cocaine dealer, Jose Acosta, a/k/a "Chino," was shot to death at a stash house in Manhattan during the course of a robbery. The robbery was committed by a violent home invasion robbery crew. Vladimir Delacruz was one of the members of the crew, but was not present during the robbery/homicide, as he had been arrested the previous night. Chino vowed to avenge the murder of his brother and, accordingly, after paying Delacruz to provide him with information about the crew's members, he took steps to solicit the services of Rafael Francisco, a/k/a "67," to kill all of those involved in the robbery that led to his brother's death.

Francisco quickly agreed to commit the murders, after being assured that he and others from the Parking Lot –

defendants Jose Peña and Hector Raymond Peña, and Richard
Fontanez, a/k/a "Romantico" (collectively, the "Parking Lot
Crew") – would be paid a handsome sum for their services. Chino
provided Francisco with information about the identities of the
persons involved in the robbery of his stash house and the murder
of his brother, the cars they drove, and where they lived,
information that had been sold to him by Vladimir Delacruz. This
information was passed on to Francisco, who used it to conduct
surveillance of at least one of the intended victims, known as
"Beto" and "Vegetal," and whose true name was Jose Suarez.

In the early morning hours of June 25, 1997, Francisco,
Fontanez, Jose Peña, and Hector Raymond Peña drove to Suarez's
home in the Bronx, dressed as law enforcement officers and armed
with guns.  Jose Suarez and Juan Carmona, the latter of whom, it
turned out, had nothing to do with the robbery of Chino's stash
house and the murder of Chino's brother, were abducted at
gunpoint and taken back to the Parking Lot.  Suarez's Toyota Land
Cruiser was driven back to the Parking Lot by Romantico.  Suarez
and Carmona were bound by the wrists and then shot through their
heads.  Their bodies were later burned beyond recognition inside
of Suarez's Land Cruiser.

After burning the bodies, the murderers returned to the
Parking Lot where they were payed thousands of dollars for the
murder.  CW-1 was later told that the same weapon used to kill

Pedro Medina – a .38 caliber revolver – had been used to kill Suarez and Carmona.  That fact has been confirmed through ballistics testing.

D.    **The Parking Lot at 156th Street and Southern Boulevard**

At the time of the events at issue in this trial, the cooperating witnesses and the defendants Jose Peña and Hector Raymond Peña, along with Rafael Francisco, a/k/a "67," and Richard Fontanez, a/k/a "Romantico," among others, all hung out together at the Parking Lot.  There, they discussed and planned crimes, including the charged murders, robberies of drug dealers, and other acts of violence, regrouped after committing those crimes, rehashed the details of the offenses, and took steps to cover up their illegal acts.  At that time, the defendants Jose Peña and Hector Raymond Peña, along with Rafael Francisco, Richard Fontanez, and others,  were members of the Parking Lot Crew.  The crew robbed drug dealers and others by impersonating police.  Several of the cooperating witnesses will testify that they committed robberies with members of the Parking Lot Crew, including defendants Jose Peña and Hector Raymond Peña, and Rafael Francisco and Richard Fontanez, during which the Parking Lot Crew impersonated police by, for example, donning law enforcement jackets and displaying badges, and/or that they were told by the defendants about their commission of these home invasion robberies.  Several of the cooperating witnesses will

testify that guns used in those robberies, and later, in the charged murders, were sometimes stored and hidden at the Parking Lot, and that the defendants also stored their police impersonation paraphernalia there.

## I. EVIDENCE OF OTHER BAD ACTS COMMITTED BY THE DEFENDANTS IS ADMISSIBLE

All of the other bad act evidence that the Government intends to prove at trial is admissible. As to some of that evidence, it is admissible as direct proof of the charged murder-for-hire conspiracies and substantive murder counts. As to other of that evidence, it is admissible as background to the charged conspiracies, because it demonstrates the criminal relationship that existed between the cooperating witnesses and the defendants prior to and at the time of the charged murders, and/or demonstrates the *modus operandi* employed by the defendants to commit the murders and/or is evidence of a subsequent and prior course of criminal dealings between the defendants, the cooperators and others.

## A.    Applicable Law

The Second Circuit follows an "'inclusionary approach' to the admission of prior-act evidence," in which "evidence of prior crimes, wrongs, or acts is admissible for *any* purpose other than to show a defendant's criminal propensity." *United States* v. *LaSanta*, 978 F.2d 1300, 1307 (1992) (citations and internal quotations omitted) (emphasis in original), *abrogated on other grounds*, 526 U.S. 559 (1994); *accord United States* v. *Curley*, 639 F.3d 50, 56 (2d Cir. 2011).  Indeed, evidence of uncharged criminal activity is not even considered "other crimes" evidence under Rule 404(b) "if it arose out of the same transaction or series of transactions as the charged offense, or if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial." *United States* v. *Towne*, 870 F.2d 880, 886 (2d Cir. 1989) (citations omitted) (alterations in original).

Likewise, prior dealings among a defendant and his co-conspirators, and others, that provide the explanation for, and essential background of, the charged offenses that were eventually committed by the defendants is not considered "other crimes" evidence under Rule 404(b).  Moreover, if such evidence explains the relationship of trust between a defendant and his co-conspirators and provides the jury with the complete story of the crime, it is not "other act" evidence and is admissible as

direct evidence of the conspiracy itself. *See, e.g.*, *United States* v. *Fabian*, 312 F.3d 550, 557 (2d Cir. 2002) (affirming admission of prior drug dealing convictions in a robbery case where the evidence showed the co-conspirators' "long-standing friendship" and "made the allegation that [one co-conspirator] had served as a tipster for the robbery more likely"), *abrogated on other grounds by United States* v. *Parkes*, 497 F.3d 220, 230 (2d Cir. 2007); *United States* v. *Coonan*, 938 F.2d 1553, 1560-61 (2d Cir. 1991) ("[T]he trial court may admit evidence that does not directly establish an element of the offense charged in order to provide background for the events alleged in the indictment."

Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.") (citations omitted). Likewise, evidence that is offered to show the existence and structure of a charged conspiracy is evidence of the crime itself and not "other acts" evidence. *See United States* v. *Thai*, 29 F.3d 785, 812-13 (2d Cir. 1994) (evidence of uncharged robberies and assaults is admissible as direct evidence to show the "existence and structure" of the conspiracy); *United States* v. *Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992) ("An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not

an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged.").

Finally, evidence of other acts is admissible under Rules 404(b) and 403 of the Federal Rules of Evidence if it is: (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; (3) more probative than prejudicial; and (4) admitted subject to a limiting instruction, if such an instruction is requested. *See United States* v. *Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993); *United States* v. *Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (citing *Huddleston* v. *United States*, 485 U.S. 681, 691-92 (1988)). In short, under the Second Circuit's "inclusionary approach" to the admission of other act evidence, evidence of prior crimes, wrongs or acts is admissible for any purpose other than to show a defendant's criminal propensity. *United States* v. *Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996).[3]

---

[3] Some of the proffered evidence discussed below should also be admitted because the Government witnesses who will testify about these acts participated in the acts. Thus, it is incumbent on the Government pursuant to *United States* v. *Bagley*, 473 U.S. 667 (1985), and *Giglio* v. *United States*, 405 U.S. 150 (1972), to apprise the defendants of these acts, and the Government is permitted to elicit the witnesses' testimony about the acts "to avoid the appearance that it [is] concealing impeachment evidence from the jury." *Coonan*, 983 F.2d at 1561; *United States* v. *Louis*, 814 F.2d 852, 856 (2d Cir. 1987). Any attempt to "sanitize" the *Giglio* material by omitting the participation in those criminal acts by the defendants will only mislead the jury.

**B.      The Incidents and Other Evidence to Be Introduced at Trial, and the Bases of Admissibility for Such Evidence**

The Government expects to introduce the following evidence at trial, all of which is admissible for the reasons set forth below.

**1.      Prior Arrests and Guilty Pleas of Each of the Defendants**

The Government seeks to admit proof of the following arrests of each of the defendants, as well as certain of their plea allocutions regarding those crimes[4]:

- On June 25, 1997, hours after the charged double murder of Juan Carmona and Jose Suarez, defendant Hector Raymond Peña was arrested in possession of a .40 caliber firearm and police paraphernalia, including badges, a bullet-proof vest and plastic zip ties, typically used to bind the hands of intended victims, and actually used to bind the hands of one of the victims of the charged double murder.  Many of these items were discovered in the trunk of Peña's car.  Peña later pled guilty to attempted possession of the gun.

- On July 10, 1997, defendant Jose Peña was arrested with Richard Fontanez, a/k/a "Romantico," and a cooperating witness on the Cross Bronx Expressway after leading the police on a high-speed chase.

- On January 28, 1998, Jose Peña was arrested after selling cocaine to an unapprehended buyer at the Alphabet City Spot.  Ten glassines of cocaine were recovered, two of which were in Peña's hand.  Peña later pled guilty to criminal possession of a controlled substance with respect to this arrest.

---

[4]      The Government also intends to present evidence of the October 3, 1997 arrest of Rafael Francisco, a/k/a "67," in possession of a 9 millimeter firearm.  Francisco has pled guilty in this case and will not be a defendant at this trial.

- On March 1, 1998 Jose Peña was arrested, along with the girlfriend of CW-2 and another member of Solid Gold, at Solid Gold's drug spot on the lower east side of Manhattan (the "Alphabet City Spot") for selling cocaine to an undercover police officer. Peña later pled guilty to attempted criminal sale of a controlled substance with respect to this arrest.

Evidence of all of the above arrests is relevant and admissible at trial for a number of reasons. Hector Raymond Peña's June 25, 1997 gun arrest – only hours after Juan Carmona and Jose Suarez were murdered by Peña and other members of the Parking Lot Crew – is direct proof of the charged murder conspiracies as cooperating witnesses will testify that members of the Parking Lot Crew had a number of guns when they abducted Pedro Medina, including the .40 caliber Glock firearm with which Peña was arrested. Moreover, the Government will argue that the robbery paraphernalia found in the trunk of Peña's car by the police was the very same gear used to commit the murders of Jose Suarez and Juan Carmona only hours earlier and, a few weeks prior, to commit the murder of Pedro Medina.[5]

The July 10, 1997 arrests of Jose Peña, Richard Fontanez and a cooperating witness is highly probative in that it demonstrates (1) that the three knew each other well; and (2) the criminal relationship and relationship of trust that existed

---

[5] Several cooperating witnesses will testify that members of the Parking Lot Crew, including the Peña brothers, Francisco, and Fontanez regularly stored their police impersonation and robbery tools in cars that were kept at the Parking Lot.

among them around the time of the double murder.  Several
cooperating witnesses will testify that Peña and Fontanez were
among the Parking Lot Crew members hired by Chino to murder
Suarez and Carmona, and that the cooperator was involved in that
plot as well.

Jose Peña's two drug arrests at the Alphabet City Spot
in 1998 demonstrates his close relationship with members of Solid
Gold who hired Peña and other members of the Parking Lot Crew to
murder Pedro Medina in 1997.  Moreover, several cooperating
witnesses will testify that Peña worked at the Alphabet City Spot
for Solid Gold and was compensated for doing so.  Thus, the
arrests, which confirm his employment by Solid Gold, are also
evidence that Peña had a monetary motive for killing Medina and
securing the Alphabet City Spot for Solid Gold above and beyond
the immediate compensation he received for that murder.

> **2.    The Participation of Defendants Jose Peña and
> Hector Raymond Peña, along with Several
> Cooperating Witnesses, in the Robberies and
> Attempted Robberies of Drug Dealers**

Several of the cooperating witnesses will testify that
they committed robberies and attempted robberies of drug dealers
with defendants Jose Peña, Hector Raymond Peña, and with Rafael
Francisco and Richard Fontanez, the persons who collectively
committed the charged murders.  The Government seeks to offer
proof of these robberies and attempted robberies for two reasons:
(1) to show the relationships of trust that existed between the

14

cooperators and the Parking Lot Crew, thus explaining why the cooperating witnesses trusted the defendants to such an extent that they would hire them to commit murder and why the defendants, in turn, trusted the cooperators to such a degree that they would divulge to them their involvement in the double murder; and (2) to demonstrate the *modus operandi* of the Parking Lot Crew – impersonating police officers to commit crimes, including the charged murders – and to confirm that they had ready access to the police paraphernalia they used to do so.

### 3. Robberies of Illegal Gambling Establishments By Defendants Jose Peña and Hector Raymond Peña

At least one cooperating witness will testify that the Peña brothers told the cooperator that they had committed robberies of illegal gambling establishments by impersonating police. This evidence is highly relevant in that it demonstrates the *modus operandi* employed by the defendants to commit crimes, including the charged murders, *i.e.,* by impersonating police officers, and also shows that the defendants had ready access to police paraphernalia of the type used in the commission of the charged murders.

### 4. The Kidnaping and Attempted Murder of a Drug Dealer by Rafael Francisco and Defendant Hector Raymond Peña Shortly Before the Murder of Pedro Medina and the Subsequent Efforts of Defendant Jose Peña to Locate and Kill the Drug Dealer

Several cooperating witnesses will testify that less than a year before the charged murders, Rafael Francisco and defendant Hector Raymond Peña agreed to kidnap and murder a drug dealer ("Dealer 1") at the behest of another drug dealer who hung out at the Parking Lot ("Dealer 2"). Francisco and Hector Raymond Peña kidnaped Dealer 1 by impersonating police officers, repeatedly stabbed Dealer 1, and left him to die. Dealer 1 survived. Thereafter, defendant Jose Peña told Dealer 2 that he would complete the murder of Dealer 1. Cooperating witnesses will testify that they conducted surveillance of Dealer 1 with Jose Peña, but that the murder was never committed. Finally, the detective who interviewed Dealer 1 after he was stabbed will testify at trial about his interaction with Dealer 1 after the stabbing incident and the stab wounds he observed on Dealer 1.

This evidence is offered (1) to show the criminal relationships between the cooperating witnesses and members of the Parking Lot Crew, including defendants Jose Peña and Hector Raymond Peña; (2) to explain why the cooperating witnesses chose to hire members of the Parking Lot Crew to commit the charged murders, *i.e.*, because they knew that the Parking Lot Crew had taken a murder contract in the past; and (3) as proof of the defendant's *modus operandi*. Moreover, this incident is *Giglio* material as to the cooperators who assisted Jose Peña in his efforts to find Dealer 1 in order to murder him. Thus, the

cooperators will have to testify about this incident as part of their own criminal history, and it would be misleading to the jury to have them testify about only part of this incident.[6]

**5.  Defendant Hector Raymond Peña's Assistance in Enforcing a Drug Debt Owed to Solid Gold**

At least one cooperating witness will testify that in approximately 1993, a member of Solid Gold was sold bad drugs. Thereafter, defendant Hector Raymond Peña and the cooperating witness, both armed with guns, confronted the drug dealer and demanded drugs or money.  This evidence is offered as proof of the longstanding relationship of trust and criminality between the cooperator and defendant Hector Raymond Peña and explains why the cooperator would trust Peña to such an extent that the cooperator would hire Peña to commit the murder of Pedro Medina and why Peña would trust the cooperator to such an extent that Peña would freely discuss the details of the double murder with the cooperator.

**6.  Defendant Jose Peña's Assistance in Enforcing a Drug Debt Owed to an Associate of Solid Gold**

At least one cooperating witness will testify that in approximately 1997, "Leo," a drug dealer, was provided drugs by a

---

[6]     In that regard, should the Court rule that evidence of the involvement of the Peña brothers in this murder plot will not be admitted at trial, the Government would not elicit any testimony by the cooperators about this incident and would request that the defendants be precluded from cross examining the cooperators about it.

close associate of Solid Gold and had failed to pay for them. Jose Peña and the cooperator confronted Leo; Peña displayed a 9-millimeter firearm that had been provided to him by the cooperator. Leo thereafter paid the Solid Gold associate for the drugs.

This evidence is offered as proof of the relationship of trust and criminality between the cooperator and defendant Jose Peña around the time of the charged murders and explains why Peña would trust the cooperator to such an extent that he would freely discuss his crimes with the cooperator, including the double murder, and why the cooperator would trust Peña to such an extent that he would hire Peña to murder Medina.

### 7. A Robbery Committed by Defendant Jose Peña and Other Members of the Parking Lot Crew

Several cooperating witnesses will testify that in approximately 1997, after the double murder, defendant Jose Peña, Rafael Francisco, a/k/a "67," and "Danillo" came to the Parking Lot with ten kilograms of cocaine that they had stolen during a robbery. The robbers gave some of those drugs to the cooperating witnesses, who then sold them at the Alphabet City Spot.

This evidence is offered as proof of the relationship of trust and criminality between the cooperators and defendant Jose Peña around the time of the charged murders and, as such, explains why Peña would trust the cooperators to such an extent that he would freely discuss his crimes with the cooperators,

18

including the double murder, and why the cooperators would trust Peña and Francisco to such a degree that they would hire them to murder Medina.

### 8. Guns and Police Paraphernalia Stashed at the Parking Lot

Each of the cooperating witnesses will testify that they saw guns and police paraphernalia at the Parking Lot around the time of the charged murders and will testify that such items were typically stored, *inter alia*, in a camper at the Parking Lot where Rafael Francisco lived at the time, and in cars that were parked at the Lot. This evidence is offered to show the relationship of trust and criminality between the cooperating witnesses and the defendants, to demonstrate the defendants' ready access to police paraphernalia and guns, which were used on the charged murders, and to prove the *modus operandi* employed by the Parking Lot Crew in committing the murders.

### 9. Defendant Jose Peña's Efforts to Locate "Rubio" Both Before and After the Double Homicide

A cooperating witness will testify that, both before and after the double homicide, defendant Jose Peña attempted to locate "Rubio," one of the members of the robbery crew present when Oliver Martinez was murdered. The purpose of locating Rubio was so that he could be murdered. This constitutes direct evidence of the charged murder-for-hire conspiracy that led to the deaths of Carmona and Suarez and is also proof of the close

criminal relationship that existed between the cooperating witness and the defendant Jose Peña. Moreover, these incidents are inextricably intertwined with the charged double murder and complete the story of those murders.

### 10. The Defendants' Use of Powder Cocaine Provided to Them By Several of the Cooperating Witnesses

Several cooperating witnesses will testify that they provided personal use amounts of cocaine to the defendants and Rafael Francisco, free of charge. On one occasion, these drugs were provided while members of the Parking Lot Crew were conducting surveillance of murder victim Jose Suarez's residence in advance of the double murder. This evidence demonstrates the close relationship of trust and criminality between the cooperating witnesses, the defendants, and Rafael Francisco. It also constitutes direct proof of the charged crimes and completes the store of the double murder.

### 11. Threats Made by Rafael Francisco and Jose Peña Against a Cooperating Witness

A cooperating witness will testify that, some time after the double murder, Rafael Francisco and defendant Jose Peña stated, in sum and substance, not to say anything about the murders because they knew where his mother lived and he therefore could not get away. This constitutes direct evidence of the participation of defendant Jose Peña in the charged crimes.

**12. Hector Raymond Peña's Incarceration at the Time of the Parking Lot Surveillance and the Peña Brothers' Incarceration at the Time a Search Warrant Was Executed at the Parking Lot**

In May 1998, a search warrant was executed at the Parking Lot. Police recovered a radio scanner, a roll of duct tape and a number of zip-ties of the type used to bind the hands of two of the murder victims. Two of the cooperating witnesses were arrested. Neither of the Peña brothers were arrested, because both were incarcerated at the time for the arrests described above.

In August 1997, police, including the New York City Police detective investigating the double murder of Suarez and Carmona, performed surveillance at the Parking Lot, which they videotaped. Jose Peña can be seen on the videotape, as can two of the cooperating witnesses. Hector Raymond Peña is not on the surveillance tape, because he was incarcerated at the time.

The Government intends to introduce the video surveillance tape and evidence concerning the search of the Parking Lot in 1998, including the identities of those arrested that day. In order to explain why the Peña brothers were not present at the Parking Lot in May 1998 and why Hector Raymond Peña is not on the surveillance video taken at the Parking Lot in August 1997, the Government seeks to elicit testimony and other proof that the two were incarcerated during those time periods.

**13.  Occasion on Which Defendant Hector Raymond
        Provided Cocaine to a Cooperating Witness to Sell
        at the Alphabet City Spot**

A cooperating witness will testify that, on at least one occasion, defendant Hector Raymond Peña provided the cooperator with powder cocaine to sell at the Alphabet City Spot. Peña had obtained that cocaine during the robbery of a drug dealer.  The cooperator sold the cocaine at the Alphabet City Spot and provided some of the proceeds to Peña.

This evidence is offered to show the relationship of trust and criminality between the cooperating witness and defendant Hector Raymond Peña, which in turn will explain why Peña felt comfortable in disclosing to the cooperator details about Peña's involvement in the double homicide.

**14.  Occasion on Which Defendant Hector Raymond Peña
        Appeared in Police Garb**

A cooperating witness will testify that, in approximately 1997, the same year as the charged murders, the cooperator saw the defendant Hector Raymond Peña in police garb. Peña asked the cooperator if he looked like a real police officer and told the cooperator that he was going to commit a robbery.

This evidence is offered to show the relationship of trust and criminality between the cooperating witness and defendant Hector Raymond Peña, which in turn will explain why Peña felt comfortable in disclosing to the cooperator details about Peña's involvement in the double homicide.  This evidence

is also proof of the *modus operandi* employed by the defendants to commit the charged crimes.

### 15. Defendant Hector Raymond Peña's Offer to a Cooperating Witness to Commit Murder

A cooperating witness will testify that, in approximately 1996, the cooperator and defendant Hector Raymond Peña were discussing the trial of Leonardo Flores, a member of Solid Gold, for three 1994 drug-related homicides that Solid Gold members had committed at Solid Gold's drug spot on Boston Road in the Bronx. Peña told the cooperator, in sum and substance, that it was a mistake to commit murders of drug rivals on the disputed drug turf, and that such a course of action could only lead to problems, including detection by law enforcement, for the drug crew. Peña then told the cooperator, in sum and substance, that the cooperator should have enlisted Peña to commit the 1994 murders and that, if any such murders needed to be committed in the future, the cooperator should come to Peña, who would commit them, thus ensuring that the cooperator and the cooperator's criminal associates would not be arrested.

This evidence is offered to show the relationship of trust and criminality between the cooperating witness and defendant Hector Raymond Peña, and to explain why, months after this conversation, the cooperator and the cooperator's associates would approach the Parking Lot Crew, including Peña, to murder Pedro Medina.

**16. Defendant Hector Raymond Peña's Participation in Enforcing Solid Gold's Exclusive Drug Territory at the Alphabet City Spot**

Several cooperating witnesses will testify that, after the murder of Pedro Medina, an individual attempted to encroach on Solid Gold's drug territory in Alphabet City. As a result, defendant Hector Raymond Peña, along with Rafael Francisco, a/k/a "67," and others, approached the individual at gunpoint and warned him not to make such efforts in the future. This incident is evidence of the close relationship of trust and criminality between the cooperating witnesses and the Parking Lot Crew and, is part of the charged offense, and completes the story of the murder of Pedro Medina.

**C. The Proffered Evidence Should Not Be Excluded Under Rule 403**

As demonstrated above, the proffered evidence is highly relevant and probative of the charges in the Indictment. Moreover, the defendants will not be unfairly prejudiced by the admission of such evidence. There is thus no basis to exclude it under Rule 403 of the Federal Rules of Evidence.

As explained above, much of the proof is highly probative because it is inextricably intertwined with the participation of the defendants and their co-conspirators in the charged murder-for-hire conspiracies, and is necessary to explain the background of the charged acts and the relationships among the co-conspirators. Much of the proffered evidence is, in fact,

direct proof of the charged offenses.  Given the fact that these and similar acts were part and parcel of the defendants' participation in the charged conduct with their co-conspirators, admission of the evidence would not result in any unfair prejudice, let alone unfair prejudice that substantially outweighs the probative value of the evidence.

Further, most of the proffered evidence is considerably less sensational than the charged crimes of murder-for-hire, which were carefully planned executions.  There is, therefore, no danger that the admission of this evidence would inflame the jury.  *See United States* v. *Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (in narcotics case, evidence of prior narcotics transactions admitted where other acts evidence "'did not involve conduct any more sensational or disturbing than the crimes with which [the appellants were] charged'") (quoting *United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990)).

## II.  STATEMENTS OF NON-TESTIFYING WITNESSES

The Government expects that the cooperating witnesses, as well as at least one lay witness, will testify about statements made to them by non-testifying witnesses about the murders and events leading up to the murders.  In particular the Government expects to elicit testimony falling into the following categories:

1.  Statements made by CW-1 to CW-3 about the double murder. CW-1 and CW-3 were co-conspirators with respect to the murder of Pedro Medina and with respect to the underlying conspiracy to distribute narcotics at the Alphabet City Spot. CW-1 and CW-3 were not co-conspirators as to the double murder.

2.  Statements made by CW-1, CW-2, and CW-3 to CW-4 about the charged murders. CW-1, CW-2 and CW-3 were co-conspirators as to the murder of Pedro Medina, but not as to the double murder. CW-4 was not a co-conspirator as to any of the murders. CW-1, CW-2, CW-3, and CW-4 were all co-conspirators with respect to the underlying conspiracy to distribute narcotics at the Alphabet City Spot.

3.  Statements made to CW-1, CW-2, and CW-3 by Rafael Francisco, a/k/a "67," Richard Fontanez, a/k/a "Romantico," and another participant ("Participant 1") in the charged double murder.

4.  Statements made by Jose Acosta, a/k/a "Chino," about the double murder and events leading up to the double murder, to a cooperating witness and a lay witness ("Lay Witness 1"), both of whom were co-conspirators with Chino as to the double murder.

These statements are admissible, as discussed below, either as co-conspirator statements, pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence, or as statements against interest, pursuant to Rule 804(b)(3) of the Federal Rules of Evidence.

**A.  Applicable Law**

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The hearsay rule, however, has important exceptions. One is that the hearsay rule does not exclude the

out-of-court statements of an unavailable declarant if the statements were against the declarant's penal interest. *See* Fed. R. Evid. 804(b)(3); *United States* v. *Williams*, 506 F.3d 151, 155 (2d Cir. 2007). A statement is sufficiently against the declarant's penal interest if:

> a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose the declarant to civil or criminal liability.

*Id.* Moreover, although "non-self inculpatory statements . . . made within a broader narrative that is generally self-inculpatory" are not admissible as statements against penal interest, *Williamson* v. *United States*, 512 U.S. 594, 600-01 (1994), a statement describing inculpatory acts committed by the declarant and a defendant are admissible in full as statements against the declarant's self-interest, especially where the context of the statement demonstrates that the declarant was not attempting to "minimize his own culpability, shift blame onto [the defendant], or curry favor with authorities." *Williams*, 506 F.3d at 155 (admitting statement by declarant that implicated declarant and defendant in shooting: "[W]e gave it to them niggers . . . [W]e walked up to the truck, each of us on a side of the truck and gave it to them niggers."); *accord United States* v. *Wexler*, 522 F.3d 194, 203 (2d Cir. 2008) (admitting statements

27

that implicated both declarant and defendant); *United States* v. *Saget*, 377 F.3d 223 (2d Cir. 2004) (admitting taped conversations implicating both the declarant and the defendant in joint criminal activity). Finally, because statements to associates about crimes in which the declarant participated are not testimonial, the admission of such statements does not violate the Confrontation Clause. *Williams*, 506 F.3d at 157.

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement pursuant to this rule, a district court must find two facts by a preponderance of the evidence: first, that a conspiracy that included the defendant and the declarant existed; and, second, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily* v. *United States*, 483 U.S. 171, 175 (1987); *United States* v. *Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

Although the Government must show that the defendant and the declarant belonged to the same conspiracy, they both need not be members of the charged conspiracy in order for the declarant's statement to be admissible against the defendant. *See United States* v. *Bowe*, 221 F.3d 1183, 1193 (11th Cir. 2000) ("[T]he conspiracy that forms the basis for admitting a co-

conspirator's out of court statements need not be the same conspiracy for which the defendant is charged."); *United States* v. *Arce*, 997 F.2d at 1128 (same); *United States* v. *Lyles*, 593 F.2d 182, 194 (2d Cir. 1979) ("It is settled law that the conspiracy which serves as the vehicle for the introduction of a vicarious admission by a co-conspirator need not be charged in the indictment."); *see also United States* v. *Stratton*, 779 F.2d 820, 829 (2d Cir. 1985) ("[I]t is not necessary that the Government charge a conspiracy to take advantage of Fed. R. Evid. 801(d)(2)(E)."); *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 962 (2d Cir. 1990) (same).

The Second Circuit has explained that, to admit a co-conspirator statement made in a separate conspiracy, the Government must show only that the defendant and the declarant are members of some conspiracy that somehow is "factually intertwined" with the charged offenses. *See United States* v. *Stratton*, 779 F.2d at 829 (the Government must demonstrate that the conspiracy to which the defendant and the declarant belong "is factually intertwined with the offenses being tried") (internal quotations omitted); *see also United States* v. *Lyles*, 593 F.2d at 194. This factual link requirement makes logical sense - the co-conspirator statement should not be so far removed from the charged offense as to make its probative value

questionable and cause unnecessary confusion or prejudice. *See Lyles*, 593 F.2d at 194.

Although admissible co-conspirator statements are limited to those made "in furtherance" of the conspiracy, this standard is not unduly restrictive. It permits introduction of any co-conspirator statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *United States* v. *Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988). Indeed, the requirement that the challenged statement be "in furtherance of" the conspiracy is satisfied if the statement's objective is "designed to promote or facilitate achievement of the goals of the conspiracy." *United States* v. *Rivera*, 22 F.3d 430, 436 (2d Cir. 1994). Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy, *United States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States* v. *Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

These prerequisites need be proved only by a preponderance of the evidence. *United States* v. *Orena*, 32 F.3d

704, 711 (2d Cir. 1994); *see also United States* v. *Padilla*, 203
F.3d 156, 162 (2d Cir. 2000).

Thus, the Second Circuit has found that co-conspirator
statements that "provide reassurance, or seek to induce a co-
conspirator's assistance, or serve to foster trust and
cohesiveness or inform each other as to the progress or status of
the conspiracy" further the ends of the conspiracy, *United States*
v. *Dresna*, 260 F.3d 150, 159 (2d Cir. 2001), as do statements
"that apprise a co-conspirator of the progress of the
conspiracy," *United States* v. *Rahme*, 813 F.2d 31, 36 (2d Cir.
1987). *See also United States* v. *Amato*, 15 F.3d 230, 234 (2d
Cir. 1994) (statement apprising co-conspirator in loansharking
conspiracy of status of loan was made in furtherance of the
conspiracy); *United States* v. *Rastelli*, 870 F.2d 822, 837 (2d
Cir. 1989) (statement among conspirators that defendant was
receiving proceeds of extortion was in furtherance of conspiracy
because it informed conspirators of status of conspiracy).

This is also true of statements that describe past
events. *Dresna*, 260 F.3d at 159 (in prosecution of members of
Pagans motorcycle gang, admission of statements made at gang
meeting that recounted attempted arson committed by gang
affiliate were admissible in prosecution of affiliate because
statements "could be understood as informing other co-
conspirators about the status of the conflict between two gangs,

and perhaps as an exhortation to avoid ridicule by doing things right"), *citing United States* v. *Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); *see also United States* v. *Flaharty*, 295 F.3d 182, 199-200 (2d Cir. 2002) (in CCE prosecution, in order to demonstrate the amount of money that the defendant was making from the enterprise, it was not error to permit cooperating witness to testify that co-conspirator had told witness the amount of money that defendant was making because issue was relevant to operation of enterprise).

Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." *United States* v. *Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000)(internal quotations omitted).  For example, in *United States* v. *Lozano-Reyes*, the Second Circuit affirmed the trial court's admission of co-conspirator statements relating to past events because the statements served a current purpose in the conspiracy, namely, "to engender trust, to increase [the witness's] familiarity with the conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits." *United States* v. *Lozano-Reyes*, No. 95-1707, 1996 U.S. App. LEXIS 14182, at *5 (2d Cir. June 12, 1996).

In fact, the Second Circuit has specifically allowed co-conspirator testimony where a member of an enterprise informed

another member of the enterprise about a murder that had already taken place. *United States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991). In *Simmons*, a cooperating witness was permitted to testify that four separate members of the enterprise acknowledged their participation in a murder of a debtor to the organization. *Id.* Testimony concerning these conversations was permitted under Rule 801(d)(2)(E) because "discussions of [the] murder and, the reasons for it, may well have served to promote the criminal activities of the [enterprise] by enforcing discipline among its members." *Id.* "Because these statements may have promoted cohesiveness among the Crew and *helped induce Crew member assistance in the affairs of the criminal enterprise*, the district court did not abuse its discretion in admitting the disputed testimony." *Id.* (emphasis added); *see also United States* v. *Salerno*, 868 F.2d 524, 535-37 (2d Cir. 1987) (finding co-conspirator statements were made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators, given the cooperation of a high-ranking member); *United States* v. *Ruggiero*, 726 F.2d 913, 923-24 (2d Cir. 1984) (statements made by co-conspirator Ruggiero reporting defendant Santora's role in a homicide were admissible against Santora where co-conspirator Ruggiero regularly reported the affairs of the enterprise to the declarant).

## B.    Discussion

The statements of Rafael Francisco, a/k/a "67," Jose Acosta, a/k/a "Chino," and Richard Fontanez, a/k/a "Romantico," to cooperating and lay witnesses about their participation, and the participation of their co-conspirators, including the defendants, in the charged homicides and events leading up to and shortly following the charged homicides, are excepted from the bar on hearsay testimony.

All of the statements fall into the exception for statements against interest.  Each of these three witnesses is "unavailable" as that term is defined in Rule 804(a) of the Federal Rules of Evidence.  Acosta, who is dead, is unavailable because he "is unable to be present or to testify at the hearing because of death".  *See* Fed R. Evid. 804(a)(4).  Francisco and Fontanez are unavailable because both would "refuse[] to testify about the subject matter despite a court order to do so."[7]

---

[7]    Francisco has pled guilty to the double homicide.  We have been informed by his counsel that he would not testify and would invoke his Fifth Amendment right against self-incrimination if subpoenaed to do so.  Moreover, Francisco would likely be unavailable due to a "then-existing infirmity [and] physical illness."  *See* Fed. R. Evid. 804(a)(4).  According to medical records submitted to the Court at his sentencing proceeding, Francisco suffers from any number of serious illnesses which would preclude him from testifying.  As to Fontanez, he is currently serving three twenty-five year to life sentences for murder, including the murders of Suarez and Carmona, but not the murder of Medina, for which he was never prosecuted. During the course of this investigation, law enforcement agents visited Fontanez in prison, and he told them that he would

Moreover, the statements of these three witnesses that the Government intends to offer at trial are entirely self-inculpatory, as they amount to a description of the participation of these witnesses and their co-conspirators in murders and conspiracies to commit murders. Finally, the statements concerning the murders and events leading up to the murders are not carefully crafted to inculpate someone else in order to minimize these witness's roles in the criminal conduct as the statements of these witnesses all fully implicate them in the murders. *Cf.* *Williamson* v. *United States*, 512 U.S. 594, 599-600 (1994) (holding that non-self-inculpatory, collateral portions of an otherwise self-inculpatory statement to the police should be treated as hearsay).

The statements made by Rafael Francisco, Richard Fontanez and Participant 1 to CW-1, CW-2, CW-3 and CW-4, and statements made by Jose Acosta to CW-5 and Lay Witness 1, are also admissible as co-conspirator statements.

Clearly, Francisco, Fontanez and defendant Hector Raymond Peña were co-conspirators as to the plot to murder, and the ultimate death, of Pedro Medina, and the plot to murder, and the ultimate deaths, of Jose Suarez and Juan Carmona. Moreover, because Francisco and Fontanez took the contract to kill Pedro Medina in order to assist CW-1, CW-2, and CW-3 to take over

not cooperate or testify in this matter.

Medina's spot so that CW-1, CW-2, CW-3, and CW-4, among others, could sell large amounts of cocaine and heroin there, they were also members, along with CW-1, CW-2, CW-3 and CW-4, of the conspiracy to distribute drugs at the Alphabet City Spot. Thus, all of the statements made by Francisco and Fontanez to CW-1, CW-2, CW-3, and CW-4, both about the murder of Medina and the double murder that took place mere weeks later, are co-conspirator statements.

Likewise, because CW-1, CW-2, CW-3 and CW-4 were all members of the conspiracy to distribute narcotics in Alphabet City, all statements made by them to each other are co-conspirator statements.

Finally, Jose Acosta, a/k/a "Chino," CW-5 and Lay Witness 1 were all members of a conspiracy to distribute Acosta's cocaine, and were members of the conspiracy to kill members of the robbery crew who murdered Oliver Martinez. Their statements to each other are co-conspirator statements.

As the Government previously explained in its response to defendant Hector Raymond Peña's motion to sever, there is significant factual overlap between the two charged murder for hire conspiracies, in terms of participants, *modus operandi*, and the weapon used to commit the three murders. All the murders were planned at the Parking Lot by all of the participants. The Parking Lot was also used, moreover, to prepare for the murders

and as a gathering place after the executions took place where the participants and the cooperating witnesses discussed the details of the murders with each other. Each and every participant in these murders had a vested interest in keeping each other apprised of the details of their criminal acts. The relationships among all of the participants, including the defendants and the cooperating witnesses, were almost exclusively criminal in nature, involving a continuing course of murder, robberies and drug dealing, among other criminal acts. Their statements to each other, whether about crimes they committed together or with others, are close in time to the charged murders, served to "foster trust and cohesiveness or inform each other as to the progress or status of the conspirac[ies]." *Dresna*, 260 F.3d at 159. Thus, all of the statements are admissible as co-conspirator statements made in furtherance of those conspiracies. The Government therefore requests that the cooperating witnesses be permitted to testify about statements made to them by their co-conspirators concerning the charged murders.[8]

_____

[8] The Government expects to elicit testimony from several cooperating witnesses that Rafael Francisco and Hector Raymond Peña continued to assist Solid Gold enforce its drug territory in Alphabet City even after all the murders had been committed. Thus, it is clear that the criminal conspiracies between the cooperators and the Parking Lot Crew did not end after Pedro Medina was murdered.

## III. THE COURT SHOULD LIMIT THE CROSS-EXAMINATION OF CERTAIN OF THE COOPERATING WITNESSES

The Government is seeking to limit the cross-examination of three cooperating witnesses, CW-2, CW-3 and CW-5, concerning prior conduct and arrests that have no bearing on their credibility and that are irrelevant to the issues in this trial. These limitations are sought because cross-examination on these topics would serve only to inflame the jury, and, as these matters do not impact on the truth-telling abilities of these witnesses, cross-examination concerning these matters would serve no useful or legitimate purpose.

### A. Applicable Law

The Confrontation Clause of the Sixth Amendment guarantees the right of a defendant in a criminal case to be confronted with the witnesses against him. *Delaware* v. *Van Arsdall*, 475 U.S. 673, 678 (1986); *United States* v. *Maldonado-Rivera*, 922 F.2d 934, 955 (2d Cir. 1990). "This means more than being allowed to confront the witness physically, for the main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." *Maldonado-Rivera*, 922 F.2d at 955 (internal quotation and citations omitted).

The Confrontation Clause does not, however, deprive the trial judge of all discretion in setting limits on cross-examination during trial:

> On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.

*Van Ardsall*, 475 U.S. at 679.

Indeed, in keeping with these Constitutional principles, the Federal Rules of Evidence provide instructions for trial judges regarding the proper scope and subject matters of cross-examination. *See Maldonado-Rivera*, 922 F.2d at 955-56. Of particular relevance here, Rule 609(a) provides, *inter alia*, that evidence that a witness other than the defendant has been convicted of a crime shall be admitted, "subject to Rule 403, if the crime was punishable by death or imprisonment in excess of one year" or if the crime "involved dishonesty or false statement, regardless of the punishment." "Crimes of force, such as armed robbery or assault, or crimes of stealth, such as burglary or petit larceny, do not come within" Rule 609(a)(2). *United States* v. *Hayes*, 553 F.2d 824 ,827 (2d Cir. 1977); *see also United States* v. *Estrada*, 430 F.3d 606, 614 (2d Cir. 2005). Likewise, the Second Circuit long ago noted that it is proper for a District Court to preclude questioning of a prosecution witness

regarding sex crimes as having an insufficient bearing on the witness's credibility. *See United States* v. *Rosa*, 11 F.3d 316, 336 (2d Cir. 1993) ("Nor was it an abuse of discretion to exclude evidence of certain types of acts such as rape and burglary as having an insufficient bearing on the witness's credibility"); *United States* v. *Rabinowitz*, 578 F.2d 910, 912 (2d Cir. 1978) (District Court properly precluded questions regarding "prior acts of sodomy upon young children" because such acts did not bear on the witness' credibility).

The Federal Rules of Evidence further limit the introduction of evidence of prior acts by the witness that did *not* result in a conviction. Rule 608(b) provides that, "specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence." This rule gives broad discretion to the trial judge to limit cross-examination in this area. It states that "in the discretion of the court, if probative of truthfulness or untruthfulness," specific instances of prior conduct "may" be inquired into on cross-examination "concerning a witness' character for truthfulness or untruthfulness." Fed. R. Evid. 608(b)(1). Rule 611 makes clear, however, that "cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the

witnesses." Rule 611(a) also provides that the court should "protect witnesses from harassment or undue embarrassment." Additionally, any such cross examination would have to satisfy the requirements of Rules 403 and 404(b).

**B.  Discussion**

CW-2, CW-3 and CW-5 are expected to testify as cooperating witnesses for the Government.

CW-2 has disclosed to the Government that, some years ago, he hit his girlfriend on several occasions while the two were fighting.  CW-2 did not use a weapon on any of these occasions and the girlfriend did not suffer serious injury.

On or about May 12, 1999, CW-3 was arrested and charged with Rape in the First Degree, in violation of New York Penal Law 130.25, and Assault in the Second Degree, in violation of New York Penal Law 120.05.  The charges were ultimately dismissed.  The Government understands, through conversations with CW-3 and follow-up investigation by law enforcement agents, that the charges were dismissed after CW-3 provided DNA which excluded CW-3 as a suspect.

CW-5 has disclosed to the Government CW-5's involvement in several instances of domestic violence. As evidenced by CW-5's rap sheet, and as CW-5 has disclosed to the Government, on three occasions, CW-5 was arrested for domestic violence incidents involving disputes with the mothers of his children.  First, on

July 19, 1994, CW-5 was arrested and charged with striking his wife with a wire cable. Those charges were ultimately dismissed. Second, on August 2, 2003, CW-5 was arrested and charged with threatening his wife with an ice pick. On December 9, 2003, CW-5 pleaded guilty in Bronx County Criminal Court to attempted possession of a weapon in the fourth degree, a misdemeanor, in full satisfaction of the initial charges. Third, on January 11, 2006, CW-5 was arrested and charged with punching his wife and holding a knife to her throat, allegations CW-5 denies. Those charges were ultimately dismissed.

As a general matter, because the domestic violence and rape charges are not "probative of the character for truthfulness or untruthfulness" of CW-2, CW-3 and CW-5, they are not proper subjects of cross-examination. Fed. R. Evid. 608(b). This type of evidence simply has no bearing on the ability of CW-2, CW-3 and CW-5 to tell the truth and should therefore be precluded. *United States* v. *Rabinowitz*, 578 F.2d 910, 912 (2d Cir. 1978). Likewise, as noted above, with respect to CW-3's rape arrest, the Second Circuit has repeatedly found that it is proper for a district court to preclude questioning of a prosecution witness regarding sex crimes because such crimes have an insufficient bearing on the witness's credibility.

Moreover, the Government does *not* seek to preclude appropriate inquiry into the testimony of CS-2 and CW-3 with

respect to their participation in robberies, drug trafficking, and other criminal which acts CW-2 and CW-3 will testify about at trial. Nor does the Government seek to preclude appropriate cross-examination about the participation of CW-2 and CW-3 in the murder of Pedro Medina. Likewise, the Government does not seek to preclude cross-examination of CW-5 concerning CW-5's participation in drug dealing and in the murders of Juan Carmona and Jose Suarez. Indeed, the Government intends to elicit testimony from CW-2, CW-3 and CW-5 concerning other aspects of their criminal history and the fact that they are testifying pursuant to cooperation agreements. These facts are all proper fodder for cross-examination and provide ample grounds for the defense to attack the credibility of CW-2, CW-3 and CW-5 and their specific testimony about the defendants.

Where, as here, there is already ample, admissible information to test the credibility and motives of CW-2, CW-3 and CW-5, as well as to present the jury with more than enough information to make a discriminating appraisal of these cooperating witnesses, the defense should not be permitted to inquire regarding a prior unrelated sexual assault arrest of CW-3 which was dismissed, prior, unrelated arrests of CW-5 for domestic violence, two out of three of which were dismissed, and incidents of domestic violence committed by CW-2, which were not reported to the police, but which CW-2 disclosed to the

Government.  These subject matters are not relevant to the charges in the Indictment and are certainly inflammatory.[9]

## CONCLUSION

For the reasons set forth above, the proffered evidence and testimony is all admissible.  Moreover, the Court should limit the cross-examination by the defense of CW-2, CW-3 and CW-5 regarding inflammatory subjects that do not bear on these witnesses credibility in any way, and which could only serve to divert the jury's attention from the evidence in this case.

Dated:     New York, New York
           September 30, 2013

                          Respectfully submitted,

                          PREET BHARARA
                          United States Attorney
                          Southern District of New York

          By:   _____/s/_____
                Laurie A. Korenbaum
                Timothy D. Sini
                Micah M.J. Smith
                Assistant United States Attorneys
                Tel.: (212) 637-2266/2358/2439

---

[9]     The Honorable Robert W. Sweet precluded the cross-examination of CW-3 on his dismissed rape charge in *United States* v. *Guerrero*, 09 Cr. 339 (RWS).

## AFFIRMATION OF SERVICE

Timothy D. Sini, pursuant to 28 U.S.C. § 1746, declares:

I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York. On September 30, 2013, I caused a copy of the foregoing Government's Motions *In Limine* to be served on the following by filing a copy via ECF:

RONALD L. GARNETT, Esq.
299 Broadway, Suite 1802
New York, NY 10007-1904
Counsel for Defendant JOSE PEÑA

DEVEREAUX L. CANNICK, Esq.
Aiello & Cannick
69-06 Grand Avenue
Maspeth, NY 11378
Counsel for Defendant HECTOR RAYMOND PEÑA

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    New York, New York
          September 30, 2013

                              _____/s/_____
                              TIMOTHY D. SINI
                              Assistant United States Attorney
                              (212) 637-2358