UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                          :
UNITED STATES OF AMERICA,                 :
                                          :
                                          :        S4 09 Cr. 341
        - against -                       :
                                          :        **DECISION AND ORDER**
                                          :
JOSE PEÑA and                             :
HECTOR RAYMOND PEÑA,                      :
                                          :
                        Defendants.       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/11/2013_

**VICTOR MARRERO, United States District Judge.**

    The Government has filed motions in limine related to
the upcoming trial in this matter.  (Dkt. No. 190.)  The
Government requests that the Court (1) allow it to
introduce evidence of certain other bad acts committed by
the defendants Jose Peña and Hector Raymond Peña, (2) allow
it to introduce certain statements made by non-testifying
witnesses, and (3) limit the scope of cross examination of
certain cooperating witnesses.  Hector Raymond Peña filed a
response (Dkt. No. 205), arguing that the prior acts should
be excluded and that the defendants' rights to cross
examine witnesses should not be limited by the admission of
hearsay or restrictions on scope.

    For the reasons discussed below, the Government's
motions in limine are **GRANTED** in part and **DENIED** in part.

## I.  BACKGROUND

On April 17, 2013, the Government filed superseding indictment S4 09 Cr. 341 (the "Indictment") charging Hector Raymond Peña with the drug-related murder of Pedro Medina in Counts One, Two, and Three (in violation of 18 U.S.C. §§ 1958, 2, and 924(j)) and both defendants in the drug-related murders of Jose Suarez and Juan Carmona in Counts Four, Five, Six, Seven, and Eight (in violation of 18 U.S.C. §§ 1958, 2, and 924(j)).[1]

## II.  INTRODUCTION OF OTHER BAD ACTS

The Government lists sixteen specific categories of other bad act evidence: (1) defendants' prior arrests and guilty pleas; (2) defendants' participation in the robberies and attempted robberies of drug dealers; (3) defendants' robberies of illegal gambling establishments; (4) defendants' involvement in the kidnapping and attempted murder of a drug dealer; (5) Hector Raymond Peña's enforcement of a drug debt; (6) Jose Peña's enforcement of a drug debt; (7) Jose Peña's involvement in a robbery; (8) guns and police paraphernalia located where the defendants were known to congregate; (9) Jose Peña's efforts to locate another potential victim; (10) defendants' use of cocaine;

---

[1] The Indictment also charged defendant Vladimir Delacruz in Counts Five and Six, but he subsequently pleaded guilty, leaving only two defendants in this matter.

(11) Jose Peña's threats against a witness; (12) defendants' prior incarceration; (13) an instance where Hector Raymond Peña supplied a cooperating witness with cocaine to sell; (14) an instance where Hector Raymond Peña appeared in police garb; (15) Hector Raymond Peña's offer to a cooperating witness to commit murder; and (16) Hector Raymond Peña's enforcement of drug territory.[2]

The Government asserts these categories of other bad acts are admissible under one or more of the following theories: direct proof of the charged conduct; background evidence to the charged conduct demonstrating the criminal relationship between the defendants and cooperating witnesses; evidence of defendants' modus operandi; and/or, evidence of subsequent and prior course of criminal dealings between the defendants, cooperators, and others. In his opposition, defendant Hector Raymond Peña argues that evidence of these acts should be excluded as irrelevant and potentially prejudicial.

Rule 404(b) provides that evidence of prior bad acts "may" be admissible to establish "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The Second Circuit "follows the 'inclusionary' approach to 'other crimes, wrongs, or acts'

---

[2] Subsequent references to the categories of other act evidence will relate to their position in this list (e.g., "Category 1").

evidence, under which such evidence is admissible unless it is introduced for the sole purpose of showing the defendant's bad character, or unless it is overly prejudicial under [Federal Rule of Evidence] 403 or not relevant under [Federal Rule of Evidence] 402." United States v. Carlton, 534 F.3d 97, 101 (2d Cir. 2008) (citation omitted). A district court properly admits such evidence under Rule 404(b) of the Federal Rules of Evidence when "(1) the prior acts evidence [i]s offered for a proper purpose; (2) the evidence [i]s relevant to a disputed issue; (3) the probative value of the prior act evidence substantially outweigh[s] the danger of its unfair prejudice; and (4) the court administer[s] an appropriate limiting instruction." United States v. Brand, 467 F.3d 179, 196 (2d Cir. 2006) (citation omitted). When offered to prove identity through "modus operandi," the prior acts must "share an unusual characteristic or signature" with the charged offenses. See Universe Antiques, Inc. v. Vareika, No. 10 Civ. 3629, 2011 WL 5117057, at *3 (S.D.N.Y. Oct. 21, 2011). A district court enjoys "broad discretion" in determining whether to admit evidence pursuant to Rule 404(b). Berkovich v. Hicks, 922 F.2d 1018, 1022 (2d Cir. 1991).

Evidence of other uncharged conduct is not considered "bad act" evidence or subject to Rule 404(b) analysis if it "'arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial.'" United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (quoting United States v. Weeks, 716 F.2d 830, 832 (11th Cir. 1983)). This type of evidence need not "directly establish an element of the offense charged," rather it can "provide background" for the alleged events, and may be admitted to show "the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) (citation and quotations omitted).

The Court considers each category of evidence in turn, consolidating them into groups where appropriate.

A. CATEGORY 1: DEFENDANTS' PRIOR ARRESTS AND GUILTY PLEAS

The Government seeks to introduce evidence of four arrests: one of Hector Raymond Peña and three of Jose Peña.

Hector Raymond Peña was arrested on June 25, 1997, the same day that Suarez and Carmona were killed. At the time

of his arrest, Hector Raymond Peña was in possession of a firearm and various police paraphernalia. Given the timing of the arrest and the fact that it involved exactly the type of physical evidence alleged in the charged conduct, the Court is persuaded that it is admissible as direct evidence of the charged conspiracies.

Jose Peña was arrested after leading police on a high-speed chase on July 10, 1997 along with two other men alleged to have participated in the killing of Suarez and Carmona. While not direct evidence of the charged conduct, the Government argues that this arrest establishes that Jose Peña knew the other two men well and that the three had a criminal relationship and relationship of trust. Although the Government should endeavor to, if possible, establish these relationships through other means unconnected to a prior arrest, the Court is persuaded that, with a proper limiting instruction, evidence of the July 10, 1997 arrest is admissible for this purpose. The Court notes that the risk of prejudice is reduced where, as here, the conduct alleged in the other arrest (a high-speed chase) is substantially less shocking than the charged conduct.

However, the Court is not persuaded that evidence of Jose Peña's two other arrests is admissible. Jose Peña was

arrested twice early in 1998 for selling cocaine. The Government contends that these arrests help establish his ties to the "Solid Gold" drug dealers who were responsible for hiring out the murder of Pedro Medina. As Jose Peña is not charged in connection with Medina's death and Solid Gold is not alleged to have been involved with the deaths of Suarez and Carmona, any probative value of the arrests clearly would be outweighed by the risk of prejudice to Jose Peña, in the form of unfair conclusions regarding propensity or in the form of jury confusion.

B. CATEGORIES 2, 3, 4, 8 & 14: DEFENDANTS' PARTICIPATION IN VARIOUS ROBBERIES AND ATTEMPTED ROBBERIES AND A KIDNAPPING AND ATTEMPTED MURDER, EVIDENCE OF GUNS AND POLICE PARAPHERNALIA, AND HECTOR RAYMOND PEÑA'S APPEARANCE IN POLICE GARB

The Government seeks to introduce evidence of the defendants' prior involvement in robberies and attempted robberies of drug dealers with two individuals who committed the charged murders, as well as evidence of the defendants' prior robberies of illegal gambling establishments. The Court is persuaded that evidence of these former robberies and attempted robberies is admissible under Rule 404(b) because in each instance the defendants are alleged to have impersonated police officers -- just as they are alleged to have done in committing the crimes alleged in the Indictment. Thus, this conduct

appears to qualify as establishing a modus operandi "signature." See Vareika, 2011 WL 5117057, at *3 (allowing evidence to show modus operandi where prior act and charged offenses "share[d] an unusual characteristic or signature"). That guns and police paraphernalia were stored where the defendants congregated, and that Hector Raymond Peña on one occasion wore police paraphernalia and told a cooperating witness that he was going to commit a robbery, are also indicative of this modus operandi.[3] Moreover, the obvious probative value of this evidence substantially outweighs any risk of prejudice to the defendants.

C. CATEGORIES 9, 10, 11, 16: JOSE PEÑA'S EFFORTS TO LOCATE ANOTHER POTENTIAL VICTIM AND HIS THREATS AGAINST A WITNESS, DEFENDANTS' USE OF COCAINE, AND HECTOR RAYMOND PEÑA'S ENFORCEMENT OF DRUG TERRITORY

The Government seeks to introduce evidence that (1) both before and after Suarez and Carmona were killed, Jose Peña attempted to locate a man linked to Suarez and Carmona named "Rubio" so that he too could be killed, and (2) after Suarez and Carmona were killed, Jose Peña threatened a potential witness not to say anything about the two

---

[3] In addition, to the extent these types of evidence establish the relationship between the defendants and cooperators (i.e., the robberies and attempted robberies committed with the two individuals alleged to have joined in the committing of the charged murders, and Hector Raymond Peña's conversation with a cooperator while wearing police garb), they are likewise admissible.

killings by intimating he knew where the witness' mother lived. The Court need not engage Rule 404(b) with respect to these categories as they are both inextricably intertwined with the deaths of Suarez and Carmona and are thus admissible as direct evidence of the charged conduct.

Similarly, testimony that Hector Raymond Peña defended Solid Gold's drug territory after the death of Medina constitutes direct evidence of the charged conduct as it is intertwined with the charged conduct and helps complete the story. In addition, to the extent these types of evidence establish the relationship between the defendants and cooperators (i.e., an individual allegedly involved in Medina's death also helped Hector Raymond Peña defend Solid Gold's territory, the same individual also threatened the witness with Jose Peña) they are likewise admissible.

The Court is not persuaded that the fact that the cooperating witnesses provided personal use amounts of cocaine to the defendants free of charge "constitutes direct proof of the charged crimes and completes the stor[y] of the double murder." (Dkt. No. 190 at p.20.) The Government notes that on one occasion, this occurred while certain individuals were conducting surveillance of Suarez's home. While evidence of the surveillance itself may constitute direct proof, the Court is not persuaded

that drug possession or use in connection with that episode qualifies. While not admissible as direct proof of the charged conduct, however, evidence that cooperating witnesses supplied defendants and another co-conspirator with drugs (especially where the drugs are shared without charge) does help to establish close relationships of trust and criminality between these parties, and is thus admissible for that purpose.

D. CATEGORIES 5, 6, 7, 13 & 15: DEFENDANTS' ENFORCEMENT OF DRUG DEBTS, HECTOR RAYMOND PEÑA'S OFFER TO COMMIT MURDER, AND INSTANCES WHERE THE DEFENDANTS SUPPLIED COOPERATORS WITH COCAINE TO SELL

The Government seeks to introduce these categories of evidence primarily to establish various relationships of trust and criminality between the defendants and cooperating witnesses. First, the Government seeks to establish the defendants' relationships with cooperating witnesses by offering testimony of Hector Raymond Peña's efforts to enforce a drug debt owed to Solid Gold in 1993, his statements to a cooperator that Solid Gold should have hired him for an earlier murder and should hire him in the future, and Jose Peña's efforts to enforce a drug debt owed to Solid Gold in 1997. While the Court is persuaded that evidence of Hector Raymond Peña's actions are admissible because they establish a longstanding relationship with the

-10-

cooperating witness and are probative of the cooperator's decision to hire him to kill Medina, it reaches the opposite conclusion with respect to Jose Peña's actions for the same reasons stated earlier: Jose Peña is not otherwise linked to Solid Gold in any of the charged conduct, and efforts to establish such links have dubious probative value and a high risk of prejudice.

As with the evidence of defendants' receipt of drugs from cooperating witnesses, the Court is persuaded that evidence both defendants' decision to supply cooperating witnesses with cocaine for sale (in the case of Jose Peña, cocaine he had stolen in a robbery) is properly admissible in this case. This evidence demonstrates the defendants' relationships with cooperating witnesses, as well as their knowledge of and involvement in the drug trade.[4]

E. CATEGORY 12: DEFENDANTS' PRIOR INCARCERATION

The Government intends to introduce (1) a video surveillance tape from August 1997 of the parking lot where defendants and others congregated, and (2) evidence from a May 1998 search of the parking lot. Jose Peña can be seen on the surveillance tape but Hector Raymond Peña cannot because he was incarcerated at the time. Both defendants

---

[4] To the extent the Government seeks to introduce Jose Peña's involvement with drug robbery to show, in part, that it helps establish why the cooperators would hire him to murder Medina (see Dkt. No. 190 at p.19), the Court has already rejected this reasoning.

-11-

were incarcerated in May 1998 when police searched the parking lot and arrested two of the cooperating witnesses in this case. To explain why the defendants were not present during the search and why Hector Raymond Peña does not appear on the surveillance tape, the Government seeks to introduce evidence that they were incarcerated.

Given the risk of prejudice inherent in introducing evidence of prior incarceration, see United States v. McCallum, 584 F.3d 471, 476-77 (2d Cir. 2009), the Court is not convinced that such evidence is necessary here. To begin, the Government's submission references other types of evidence linking both defendants to the parking lot, so the search evidence and surveillance video do not appear to be strictly necessary for that purpose. Moreover, the Government casts the parking lot as a veritable hub of unsavory activity populated by any number of disreputable characters, and it is unclear whether jurors would even question the reason for the defendants' absence at any given moment. For example, the Government states that two of the cooperating witnesses were arrested during the search, but gives no indication of how many other parking lot denizens were present or absent. Similarly, the Government does not allege that Hector Raymond Peña was the only regular missing from the surveillance tape or that his

attendance record was otherwise perfect, such that his absence would be peculiar. As such, the Court finds this category of evidence inadmissible. Should the issue arise at a later point -- and should the Government be able to present greater detail -- the Court may revisit this issue.

### III. <u>STATEMENTS OF NON-TESTIFYING WITNESSES</u>

The Government seeks to introduce four categories of out-of-court statements made by non-testifying witnesses: (1) statements made by one cooperating witness to another about the Suarez/Carmona killings; (2) statements made by three cooperating witnesses to a fourth about all three murders; (3) statements made to three cooperating witnesses by three participants in the Suarez/Carmona killings (Rafael Francisco, Richard Fontanez and a third unnamed participant); and (4) statements made by Jose Acosta to a cooperator and a lay witness about the Suarez/Carmona killings.

As a general matter, a statement is hearsay when it is made out of court and offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). Such statements are, subject to certain exceptions, inadmissible. Fed. R. Evid. 802. One such exception arises where (1) the declarant is unavailable as a witness, and (2) the statement in question "was so contrary to the

declarant's proprietary or pecuniary interest or had so great a tendency to . . . expose the declarant to civil or criminal liability[.]" Fed. R. Evid. 804(b)(3); see also United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007) ("Admission of a statement under Rule 804(b)(3) hinges on whether the statement was sufficiently against the declarant's penal interest that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.") (citation and quotations omitted).

Alternatively, a statement is not hearsay (as opposed to an exception) and is thus admissible if it is "offered against an opposing party and . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). In ruling on the admissibility of a statement under this rule, a court must find by a preponderance of the evidence that a conspiracy existed, that both the declarant and the defendant were part of that conspiracy, and that the statement was made during the course of and in furtherance of that conspiracy. United States v. Desena, 260 F.3d 150, 157-58 (2d Cir. 2001).

Notably, the conspiracy at issue in the introduction of a particular statement need not be the same conspiracy at issue in the case itself. Id. at 158. However, any

-14-

separate conspiracy at issue in the introduction of a co-conspirator statement must be "'factually intertwined' with the offenses being tried." United States v. Stratton, 779 F.2d 820, 829 (2d Cir. 1985) (citation omitted). "To be 'in furtherance' of a conspiracy, the statements must in some way have been designed to promote or facilitate achievement of the goals of that conspiracy, as by, for example, providing information or reassurance to a coconspirator, seeking assistance from a coconspirator, or by communicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the conspiracy's goals." United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994).

The Court considers each theory of admission in turn to determine which, if any, applies to the statements the Government seeks to introduce.

A. STATEMENTS AGAINST PENAL INTERESTS MADE BY UNAVAILABLE WITNESSES

Statements by Rafael Francisco, Richard Fontanez, and Jose Acosta appear to meet the criteria for admission under the hearsay exception for statements against penal interest. First, all three declarants are "unavailable" according to the Rules of Evidence: Acosta is deceased, and Francisco and Fontanez have refused to testify despite

court orders to do so. In addition, Francisco may possibly be considered unavailable due to physical illness. See Fed. R. Evid. 804(a) (defining "unavailable" to include, among other things, death, physical illness, and refusal to testify despite a court order). Second, the Government asserts that all statements it intends to introduce from these three declarants "are entirely self-inculpatory, as they amount to a description of the participation of these witnesses and their co-conspirators in murders and conspiracies to commit murders," and that the statements do not attempt to shift blame from the declarants to other parties. (Dkt. No. 190 at p.35.) From this description, the Court is convinced that the statements in question are admissible as hearsay exceptions, although the Court may revisit this issue when it can evaluate the actual statements themselves.

B. CO-CONSPIRATOR STATEMENTS MADE IN FURTHERANCE OF A CONSPIRACY

In order to fully and accurately address this issue, the Court finds it necessary to pause for a moment and take stock of the various conspiracies the Government alleges to have existed and their respective memberships:

- Conspiracy to Murder Medina: Hector Raymond Peña, Francisco, Fontanez, Cooperating Witness 1 ("CW-1"), Cooperating Witness 2 ("CW-2"), and Cooperating Witness 3 ("CW-3")

- Conspiracy to Murder Suarez and Carmona: Hector Raymond Peña, Jose Peña, Acosta, Francisco, Fontanez, Lay Witness 1, Participant 1, and Cooperating Witness 5 ("CW-5")

- Conspiracy to distribute narcotics in Medina's Territory: Hector Raymond Peña, Francisco, CW-1, CW-2, CW-3, and Cooperating Witness 4 ("CW-4")

The Court next considers the relevant statements in question, in order to determine whether they are properly may be considered "in furtherance" of these alleged conspiracies:

1. Statements by CW-1 to CW-3 about the Suarez/Carmona killings

The Government states that CW-1 and CW-3 are not co-conspirators as to the Suarez/Carmona killings, but are co-conspirators as to the Medina murder and narcotics distribution in Medina's territory. Even accepting the Government's representation that there is significant factual overlap for all events discussed in its submission, the Court cannot conclude that these statements by CW-1 were made "in furtherance" of either conspiracy to which CW-1 was a party. The Government does not include any specifics about the content of the statement, the date it was made, or outline any other ways in which the subject matter (the Suarez/Carmona killings) might be linked to the other conspiracies and act "in furtherance" of them,

-17-

notwithstanding the term's broad definition. As such, the Court finds the record insufficient to support a determination as to admissibility of this category of evidence at this time. Should the matter arise at a later point -- and should the Government be able to present greater detail -- the Court may revisit the issue.

2. Statements by CW-1, CW-2, and CW-3 to CW-4 about the Medina and Suarez/Carmona killings

The Government states that CW-1, CW-2, and CW-3 were all members of the conspiracy to murder Medina, and that all four were members of the conspiracy to distribute narcotics in Medina's territory -- a conspiracy that has obvious and significant overlap with the charged conduct. As such, statements by CW-1, CW-2, and CW-3 to CW-4 about the Medina killing are likely admissible as co-conspirator statements in furtherance of the conspiracy to distribute narcotics in Medina's territory, subject to the Court's ability to review the actual statements question.

Importantly, however, the Court finds that these statements would likely only be admissible against Hector Raymond Peña because the Government has not made a sufficient showing that Jose Peña was a member of either the conspiracy to murder Medina or the conspiracy to distribute narcotics in Medina's territory. In addition,

-18-

for the same reasons as stated above, the Court finds the record insufficient to support a determination as to admissibility of the statements by CW-1, CW-2, and CW-3 about the Suarez/Carmona killings, as it is unclear from the Government's submission how they could be considered "in furtherance" of the conspiracies.

   3. Statements by Francisco, Fontanez, and Participant 1,
      to CW-1, CW-2, and CW-3

The Government states that Francisco, Fontanez, Participant 1, CW-1, CW-2, and CW-3 were all co-conspirators in Medina's murder. Thus, any statements by Francisco, Fontanez, and Participant 1, to CW-1, CW-2, and CW-3 regarding the murder could plausibly be "in furtherance" of that conspiracy. However, the Government has not provided any detail as to the subject matter of these statements and so the Court reserves judgment, noting only that the admissibility of such statements would be subject to the same caveats and carve-outs as discussed above.

   4. Statements by Acosta to CW-5 and Lay Witness 1 about
      the Suarez/Carmona killings and events leading up to
      the Suarez/Carmona killings

This category appears to meet the criteria for admission against both defendants as statements by co-conspirators in furtherance of a conspiracy: Acosta, CW-5,

Lay Witness 1, and both defendants were all part of the
same conspiracy to kill Suarez and Carmona, and Acosta's
statements to his co-conspirators about those very events
appear likely to be in furtherance of that conspiracy
(although, again, the Court reserves final judgment until
it can examine the full import of each statement in
question).

### IV.  SCOPE OF CROSS-EXAMINATION OF COOPERATING WITNESSES

Finally, the Government seeks to limit the cross
examination of three cooperating witnesses, CW-2, CW-3, and
CW-5.  Generally speaking, all three witnesses have in the
past engaged in varying degrees of violent acts toward
women, which, in one instance, resulted in a criminal
misdemeanor conviction.  "The Confrontation Clause of the
Sixth Amendment guarantees the defendant in a criminal
prosecution the right to confront the witnesses against
him."  United States v. Maldonado-Rivera, 922 F.2d 934, 955
(2d Cir. 1990).  This right is perhaps best encapsulated in
a defendant's right of cross-examination.  Id.  For that
reason, "[t]he court should avoid any blanket prohibition
on exploration of an area that is central to an assessment
of the witness's reliability."  Id.

However, the court finds that the acts highlighted by
the Government are properly excluded from the scope of

cross-examination because the acts at issue do not speak to the reliability or credibility of the witnesses, and therefore the primary concern of cross-examination is not implicated by their exclusion. The Court can see no reason to depart from the general rule that evidence of past crimes relating to sex and violence are properly excluded as having insufficient bearing on a witness' credibility. See United States v. Rosa, 11 F.3d 315, 336 (2d Cir. 1993). Moreover, to the extent that most of the acts at issue did not result in convictions, the Court still finds that they are not "probative of the character for truthfulness or untruthfulness" and are properly excluded under Federal Rule of Evidence 608(b).

## V.   ORDER

For the reasons discussed above, it is hereby

**ORDERED** that the Government's motion in limine (Dkt. No. 190), to allow introduction of certain of defendant Jose Peña and defendant Hector Raymond Peña's prior acts to show knowledge and intent is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that the Government's motion in limine to allow statements of non-testifying witnesses is **GRANTED**; and it is further

**ORDERED** that the Government's motion in limine to limit the cross-examination of certain of the cooperating witnesses is **GRANTED.**

**SO ORDERED**

DATED:     New York, New York
           11 October 2013

                                        VICTOR MARRERO
                                           U.S.D.J.