```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x
                                    :
UNITED STATES OF AMERICA            :   **ECF CASE**
                                    :
        - v. -                      :   S4 09 Cr. 341 (VM)
                                    :
JOSE PEÑA,                          :
    a/k/a "Chelo," and              :
HECTOR RAYMOND PEÑA,                :
    a/k/a "Frank Rodriguez,"        :
    a/k/a "Montana,"                :
                                    :
            Defendants.             :
- - - - - - - - - - - - - - - - - -x
```

# GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN
# SUPPORT OF CERTAIN MOTIONS *IN LIMINE*

PREET BHARARA
United States Attorney for the
Southern District of New York,
Attorney for the United States
       of America

LAURIE A. KORENBAUM
TIMOTHY D. SINI
MICAH W. J. SMITH
Assistant United States Attorneys
    - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x
                                     :
UNITED STATES OF AMERICA             :      **ECF CASE**
                                     :
     - v. -                          :      S4 09 Cr. 341 (VM)
                                     :
JOSE PEÑA,                           :
    a/k/a "Chelo," and               :
HECTOR RAYMOND PEÑA,                 :
    a/k/a "Frank Rodriguez,"         :
    a/k/a "Montana,"                 :
                                     :
           Defendants.               :
                                     :
- - - - - - - - - - - - - - - - - - -x

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM IN
SUPPORT OF CERTAIN MOTIONS *IN LIMINE***

The Government respectfully submits this supplemental memorandum in support of the motions *in limine* it filed on September 30, 2013. In a Decision and Order dated October 11, 2013 (Doc. 208) ("Order"), this Court ruled that it could not, based on the information provided to the Court to that point, rule that evidence of statements made by non-testifying witnesses and certain other bad acts were admissible. At the same time, the Court provided substantial guidance about what kinds of additional information would lead to a conclusion that the evidence should be admitted. In this supplemental memorandum, the Government provides additional information about its proffered evidence and respectfully requests that the evidence be ruled admissible.

1

**BACKGROUND/RELEVANT FACTS**

The defendants are charged in an eight-count indictment with murder-for-hire, in violation of Title 18, United States Code, Section 1958, and the possession of guns used in the commission of murders, in violation of Title 18, United States Code, Section 924(j). Specifically, defendant Hector Raymond Peña, a/k/a "Frank Rodriguez," a/k/a "Montana," is charged with the drug-related murders of Pedro Medina (Counts One, Two, and Three), and Jose Suarez and Juan Carmona (Counts Four, Five, Six, Seven, and Eight). Defendant Jose Peña, a/k/a "Chelo," is charged in Counts Four, Five, Six, Seven, and Eight with the murders of Jose Suarez and Juan Carmona.

On September 30, 2013, the Government moved *in limine* (1) to allow it to introduce certain statements made by non-testifying witnesses, (2) to admit evidence of certain other bad acts committed by the defendants Jose Peña and Hector Raymond Peña, and (3) to limit the scope of cross examination of certain witnesses.

The Court's Order granted the Government's motions in part and denied them in part. With respect to statements made by non-testifying witnesses, the Court ruled that it could not, based on the information then before the Court, conclude that the following evidence was admissible: (1) statements made by Rafael Francisco, Richard Fontanez, and Participant 1 to CW-1, CW-2, and CW-3 about the murder of Pedro Medina (Order at 19); (2) statements made by CW-1 to

2

CW-3 about the murders of Jose Suarez and Juan Carmona (Order at 17-18); and (3) statements made by CW-1, CW-2, and CW-3 to CW-4 about the murders of Jose Suarez and Juan Carmona (Order at 9).[1] The Court also ruled that, based on the information then before it, statements made by CW-1, CW-2, and CW-3 to CW-4 about the murder of Pedro Medina were only admissible against defendant Hector Raymond Peña, and not against Jose Peña, because "the Government has not made a sufficient showing that Jose Peña was a member of either the conspiracy to murder Medina or the conspiracy to distribute narcotics in Medina's territory." Order at 18.

With respect to the other bad act evidence, the Court ruled that the following such evidence was not admissible, based on the information then before the Court: (1) defendant Jose Peña's two arrests in 1998 for selling cocaine (Order at 6-7); (2) defendant Jose Peña's efforts to enforce a drug debt owed to Solid Gold in 1997 (Order at 10-11); (3) defendant Hector Raymond Peña's incarceration at the time of surveillance conducted at the parking lot on Southern Boulevard in the Bronx, New York, in August 1997 (Order at 11-13);

---

[1] The Court ruled, however, that the statements of Francisco, Fontanez and Jose Acosta to cooperating and lay witnesses about their participation, and the participation of their co-conspirators, including the defendants, in the charged homicides and events leading up to and shortly following the charged homicides, are admissible as statements against penal interest. *See* Order at 15-16. The Court added the caveat that statements in which declarants attempted "to shift blame from the declarants to other parties" may not be admissible on these grounds. *Id.* at 16.

3

and (4) the defendants' incarceration at the time a search warrant was executed at the parking lot in May 1998 (Order at 11-13). The Court also ruled that the fact that cooperating witnesses supplied the defendants with drugs is admissible to establish close relationships of trust and criminality, but not as direct proof of the charged conduct (Order at 9-10).

## DISCUSSION

### I. THE STATEMENTS MADE BY NON-TESTIFYING WITNESSES

#### A. Statements Made by Francisco, Fontanez, and Participant 1 to CW-1, CW-2, and CW-3 about the Murder of Pedro Medina

In its Order, the Court recognized that statements made by Francisco, Fontanez, and Participant 1[2] to CW-1, CW-2, and CW-3 about the murder of Pedro Medina "could plausible be 'in furtherance'" of the conspiracy to murder Pedro Medina, because each of these individuals were co-conspirators in that murder. Order 19. Nonetheless, the Court reserved judgment on the admissibility of the statements because the Government had not, at that point, "provided any detail as to the subject matter of these statements." *Id.* The

---

[2] Participant 1 was a participant in the murders of Jose Suarez and Juan Carmona, but the Government is not seeking to admit any statements of Participant 1 about the murder of Pedro Medina. The Government does, however, seek to admit statements of another individual who was a co-conspirator in the Pedro Medina murder, Elyn Reynoso, a/k/a "Bibi." Reynoso was a member of Solid Gold and also worked for Pedro Medina; he double crossed Medina by providing Solid Gold information about Medina's drug territory and about Medina. Reynoso previously pleaded guilty to the murder of Medina and is not a defendant in this case.

4

Government now provides additional information about these statements and respectfully renews its request for a pretrial ruling on their admissibility.

Some of the statements in this category were made before Pedro Medina was murdered. Such statements were made in order to arrange the murder for hire contract, to plan the murder of Pedro Medina, to keep co-conspirators apprised of the progress of the conspiracy, and to maintain trust and cohesiveness among the co-conspirators. *Accord United States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991) (statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy" further the conspiracy).

For example, CW-1, CW-2, and CW-3 will testify that Elyn Reynoso, a/k/a "Bibi," gave Solid Gold information about Pedro Medina's drug spot and encouraged them to move into it. They will testify that Francisco and defendant Hector Raymond Peña agreed to take the murder for hire contract, and that Reynoso provided information about Medina's work routine and home address. They will testify that the conspirators discussed how to locate Medina, held meetings where they discussed their plans for murdering Medina, discussed how they should murder Medina at his home rather than near his drug spot, and kept each other apprised of the progress of the conspiracy. CW-3 will also testify that, on one occasion before the murder, he rode in a vehicle

5

with CW-1 and others, during which ride CW-1 pointed out an apartment building and told CW-3 that it was where Medina lived.

The remaining statements in this category were made shortly after Pedro Medina was murdered. Such statements were made to "keep coconspirators abreast of current developments and problems facing the group," *United States* v. *Jefferson*, 215 F.3d 820, 824 (8th Cir. 2000); generally to inform co-conspirators that the murder had already taken place, *see United States* v. *Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); and to discuss how payments would be made for the murder that had been completed. For example, CW-1 will testify that, shortly after the murder of Pedro Medina, Fontanez told CW-1, in sum and substance, that "the movie was made."[3] CW-1, CW-2, and CW-3 will testify that shortly after Medina's murder, Montana confirmed that the murder had been committed and described how he and the other hitmen committed it. Montana told CW-1, in sum and substance, that the job had been done cleanly and that they had been careful not to touch Medina's vehicle.

The Government respectfully submits that these and other similar statements made before and after Pedro Medina's murder are admissible pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence.

---

[3] As the Court has already ruled, statements of this variety are also admissible as being against penal interest. *See supra* at 3 n.1.

### B. Statements Made by CW-1, CW-2, and CW-3 to CW-4 about the Murder of Pedro Medina

The Court ruled in its Order that statements made by CW-1, CW-2, and CW-3 to CW-4 about the murder of Pedro Medina were admissible as co-conspirator statements against defendant Hector Raymond Peña. The Court also ruled, however, that based on the information then before it, the Court could not conclude that the statements were admissible against defendant Jose Peña because "the Government ha[d] not made a sufficient showing that Jose Peña was a member of either the conspiracy to murder Medina or the conspiracy to distribute narcotics in Medina's territory." Order at 18.

Jose Peña is not charged with the murder of Pedro Medina. But the Government respectfully proffers the following information to establish that defendant Jose Peña was a member of the conspiracy to distribute narcotics in Medina's territory. The cooperating witnesses will testify that Jose Peña not only distributed narcotics for Solid Gold, but also specifically joined Solid Gold's conspiracy to sell narcotics in Medina's territory. In particular, CW-1, CW-2, CW-3, and CW-4 will testify that after Medina's murder, Jose Peña started to work at the drug spot in Alphabet City that had belonged to Medina. CW-4 will testify that Chelo worked as a lookout at the spot. CW-3 will explain that after Medina's murder, Solid Gold divided up the shifts at Medina's former territory and Chelo began working with CW-1 and CW-2 during their shift. Moreover, the

7

cooperating witnesses will testify that when Chelo was twice arrested at the Alphabet City drug spot in 1998, he was arrested while working for Solid Gold. Indeed, two other members of Solid Gold were arrested with him. This evidence shows that Jose Peña had joined the conspiracy to sell narcotics in Pedro Medina's territory – a conspiracy that was factually intertwined with and that benefitted from Medina's murder.

Jose Peña's deep involvement in Solid Gold's narcotics conspiracy – and the intimate relationship of that conspiracy with the murder of Pedro Medina – will be further shown by cooperating witnesses who will testify that Jose Peña eventually assisted with disposing of the .38 caliber revolver that had been used to murder Pedro Medina (as well as Jose Suarez and Juan Carmona).

This Court has already recognized that (1) the conspiracy to murder Medina has "obvious and significant overlap" with the "conspiracy to distribute narcotics in Medina's territory," and (2) the statements of CW-1, CW-2, CW-3 to CW-4 about the Medina murder "are likely admissible" as having furthered "the conspiracy to distribute narcotics in Medina's territory." Order at 18.

Given the evidence proffered here that Jose Peña joined that conspiracy to distribute narcotics in Medina's territory, the Government respectfully requests a ruling that, to the extent statements by CW-1, CW-2 and CW-3 to CW-4 about the Medina murder are

admissible against defendant Hector Raymond Peña, they are admissible against defendant Jose Peña as well.

### C. Statements Made by CW-1 to CW-3 and by CW-1, CW-2 and CW-3 to CW-4 about the Murders of Jose Suarez and Juan Carmona

In its Order, the Court concluded that there was insufficient information in the Government's prior submission to support a conclusion that statements made by CW-1, CW-2, and CW-3 about the murders of Jose Suarez and Juan Carmona furthered either the conspiracy to murder Pedro Medina or the conspiracy to distribute narcotics in Medina's territory. *See* Order at 17-19. The Court did not disagree that these various conspiracies are "factually intertwined." Order at 17.

The Government now respectfully proffers the following additional information about the statements made by CW-1, CW-2 and CW-3 about the murders of Jose Suarez and Juan Carmona, in order to demonstrate precisely how these statements furthered both the conspiracy to murder Pedro Medina and the conspiracy to distribute narcotics in Medina's territory.

As with the statements about the murder of Pedro Medina, discussed above, the statements about the murders of Jose Suarez and Juan Carmona occurred both in the lead up to and the immediate aftermath of those murders. The statements made in the lead up to the double murder were made to keep members of the narcotics

9

conspiracy apprised of the nature and progress of the conspiracy to murder Jose Suarez and Juan Carmona.

Similarly, the statements made after the murders of Jose Suarez and Juan Carmona were committed were made to "keep coconspirators abreast of current developments and problems facing the group," *Jefferson*, 215 F.3d at 824; generally to inform co-conspirators that the murder had already taken place, *see Simmons*, 923 F.2d at 945; and to "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," *id.* For example, CW-3 will testify that CW-1 and CW-2 gave him details about the double murder; when these conversations occurred, CW-1, CW-2, and CW-3 were part of a conspiracy to distribute narcotics at Alphabet City in the territory that had been Medina's. CW-4 will testify that, shortly after the double murder, and while he was also a member of the narcotics distribution conspiracy at Alphabet City, CW-1 told him that defendant Hector Raymond Peña had gotten arrested.

These and similar statements were made in furtherance of both the conspiracy to distribute narcotics in Medina's territory (in which CW-1, CW-2, CW-3, and defendant Jose Peña were members) and the conspiracy to murder Medina (in which CW-1, CW-2, CW-3 were members). Defendant Hector Raymond Peña's murder of Pedro Medina paved the way for the narcotics conspiracy at Alphabet City, and thus the members

10

of the narcotics distribution conspiracy had an interest in keeping abreast of whether Hector Raymond Peña was caught or unsuccessful in his next murder for hire venture. Keeping abreast of that murder for hire was particularly important to the narcotics conspiracy because Solid Gold relied on defendant Hector Raymond Peña to help protect its turf. Moreover, cooperating witnesses will testify that members of Solid Gold provided Hector Raymond Peña and Jose Peña with drugs and other items while the defendants were engaged in surveillance of the robbery crew members being targeted by Chino, which further demonstrates the factual intertwining of the narcotics conspiracy and the conspiracy to murder Jose Suarez and other robbery crew members. Finally, as members of the conspiracy to murder Medina, CW-1, CW-2, and CW-3 also had an interest in keeping track of whether Hector Raymond Peña, who had committed the murder of Pedro Medina, was arrested conducting a similar crime with a similar modus operandi a mere six weeks later. An arrest of Hector Raymond Peña under such circumstances could have exposed the other members of the conspiracy to murder Medina to possible arrest and prosecution for that murder.

Because statements made by CW-1, CW-2, and CW-3 about the murders of Jose Suarez and Juan Carmona furthered both the conspiracy to murder Pedro Medina and the conspiracy to distribute narcotics in Medina's territory, the Government respectfully requests a ruling that they are admissible pursuant to Rule 801(d)(2)(E).

11

**II. THE OTHER BAD ACTS**

As the Court explained in its Order, the Government had not previously offered sufficient information to establish that defendant Jose Peña was a member of the conspiracy to distribute narcotics in Pedro Medina's territory. *See* Order at 18. In light of the information provided above, which demonstrates that defendant Jose Peña did join that conspiracy, the Government now respectfully requests that the Court reconsider its ruling that defendant Jose Peña's 1998 arrests for selling cocaine are inadmissible. As explained above, cooperating witnesses will testify that when Jose Peña was arrested in 1998, he was not merely selling cocaine, but was selling cocaine for Solid Gold in what had once been Medina's territory.

These convictions demonstrate Jose Peña's relationship of trust and criminality with Solid Gold, and will corroborate the testimony of the cooperating witnesses on this important point. This relationship of trust and criminality is highly relevant to the charged conduct – the murders of Jose Suarez and Juan Carmona – because several cooperating witnesses will testify that Jose Peña openly described his participation in that double murder to them. Without the context of the relationship of trust and criminality that existed between the cooperating witnesses and Jose Peña, the jury may have difficulty understanding why Jose Peña was so open with the

cooperating witnesses about the murders he committed for a different drug dealer.  Moreover, any prejudice from these arrests will be minimal, because Jose Peña's connection to Solid Gold will already be established through their connection at the parking lot at Southern Boulevard in the Bronx, and because arrests for distributing drugs is considerably less sensational than the murders for hire with which Jose Peña is charged.

For similar reasons, the Government requests that the Court reconsider its ruling that evidence of defendant Jose Peña's efforts to enforce a drug debt owed to Solid Gold in 1997 is inadmissible. This episode is significant evidence of the relationship of trust and criminality that existed between Jose Peña and members of Solid Gold, which relationship is important to understanding why Jose Peña openly recounted his participation in the murders of Jose Suarez and Juan Carmona to members of Solid Gold.

**CONCLUSION**

For the reasons set forth above, the Government respectfully submits that the proffered evidence is admissible and respectfully requests rulings to that effect.

Dated:    October 13, 2013
          New York, New York

                              Respectfully submitted,

                              PREET BHARARA
                              United States Attorney
                              Southern District of New York

                    By:    _____/s/_____
                           Laurie A. Korenbaum
                           Timothy D. Sini
                           Micah W. J. Smith
                           Assistant United States Attorneys

**AFFIRMATION OF SERVICE**

Micah W. J. Smith, pursuant to Title 28, United States Code, Section 1746, declares:

I am an Assistant United States Attorney in the Office of the United States Attorney for the Southern District of New York. On October 13, 2013, I caused a copy of the foregoing Government's Supplemental Memorandum in Support of Certain Motions *In Limine* to be served on the following by filing a copy via ECF:

    RONALD L. GARNETT, Esq.
    299 Broadway, Suite 1802
    New York, NY 10007-1904
    Counsel for JOSE PEÑA

    DEVERAUX L. CANNICK, Esq.
    Aiello & Cannick
    69-06 Grand Avenue
    Maspeth, NY 11378
    Counsel for HECTOR RAYMOND PEÑA

I declare under penalty of perjury that the foregoing is true and correct.

Dated:    October 13, 2013
            New York, New York

                                    _____/s/_____
                                    Micah W. J. Smith
                                    Assistant United States Attorney
                                    (212) 637-2439